FILED

2013 JAN 29 PM 4:46

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY:__________

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

February 2012 Grand Jury

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>SHERMAN MAZUR,<br>ARI KAPLAN,<br>GROVER HENRY COLIN NIX IV,<br>aka "Colin Nix,"<br>REGIS POSSINO,<br>EDON MOYAL,<br>MARK HARRIS,<br>JOSEPH DAVIS,<br>aka "Joey Davis,"<br>CURTIS PLATT, and<br>DWIGHT BRUNOEHLER,<br><br>Defendants. | CR No. CR 13 00062<br><br><u>I N D I C T M E N T</u><br><br>[18 U.S.C. § 371: Conspiracy; 18 U.S.C. § 1348(1): Securities Fraud; 15 U.S.C. §§ 78j(b), 78ff(a), 17 C.F.R. § 240.10b-5: Securities Fraud; 18 U.S.C. § 1343: Wire Fraud; 18 U.S.C. § 1956(a)(2)(A): International Promotional Money Laundering; 18 U.S.C. § 1956(a)(1)(B)(i): Concealment Money Laundering; 18 U.S.C. § 3147: Commission of Offense While on Pretrial Release; 18 U.S.C. §§ 981(a)(1)(A) & (C), 982(a)(1) & (2), 28 U.S.C. § 2461(c): Criminal Forfeiture; 18 U.S.C. § 2: Aiding and Abetting and Causing an Act to Be Done] |

# TABLE OF CONTENTS

PAGE

INTRODUCTORY ALLEGATIONS . . . . . . . . . . . . . . . . . . . . 1

A. SUMMARY OF THE FRAUD . . . . . . . . . . . . . . . . 1

B. THE DEFENDANTS . . . . . . . . . . . . . . . . . . . 1

C. UNINDICTED CO-CONSPIRATORS . . . . . . . . . . . . . 3

D. THE MANIPULATED STOCKS . . . . . . . . . . . . . . . 3

E. SECURITIES ENFORCEMENT, LAWS, REGULATIONS, RULES, AND MARKETS . . . . . . . . . . . . . . . . . . . . . . 4

F. MARKET MANIPULATION SCHEMES . . . . . . . . . . . . . 6

1. First Phase: Obtaining and Concealing Control and Ownership of a Public Company's Free Trading Shares . . . . . . . . . . . . . . . 7

2. Second Phase: Fraudulently Inflating the Price and Trading Volume of the Company's Stock . . . 7

3. Third Phase: Coordinated Selling of the Company's Stock . . . . . . . . . . . . . . . 9

COUNT ONE
[18 U.S.C. § 371]
[Conspiracy] . . . . . . . . . . . . . . . . . . . . . . 10

A. THE OBJECTS OF THE CONSPIRACY . . . . . . . . . . . . 10

B. THE MANNER AND MEANS OF THE CONSPIRACY . . . . . . . 11

1. Obtaining and Concealing Control and Ownership of the Manipulated Companies' Free Trading Shares . . . . . . . . . . . . . . . . . 11

2. Fraudulently Inflating the Price and Trading Volume of the Manipulated Companies' Stocks . 14

3. Coordinated Selling of the Manipulated Companies' Stocks . . . . . . . . . . . . . . 16

C. OVERT ACTS . . . . . . . . . . . . . . . . . . . . . 17

1. Overt Acts Regarding Genmed . . . . . . . . . . 17

2. Overt Acts Regarding Biostem. . . . . . . . . . 30

3. Additional Overt Acts Regarding the Scheme to Manipulate the Stocks of Public Companies. . . 39

COUNT TWO
[18 U.S.C. § 1348(1)]
[Securities Fraud] . . . . . . . . . . . . . . . . . . . . 42

COUNT THREE
[18 U.S.C. § 1348(1)]
[Securities Fraud] . . . . . . . . . . . . . . . . . . . . 43

COUNTS FOUR THROUGH FIFTEEN
[15 U.S.C. §§ 78j(b), 78ff; 17 C.F.R. § 240.10b-5]
[Securities Fraud] . . . . . . . . . . . . . . . . . . . . 44

COUNTS SIXTEEN THROUGH TWENTY-FOUR
[18 U.S.C. § 1343]
[Wire Fraud] . . . . . . . . . . . . . . . . . . . . . . 48

A. THE SCHEME TO DEFRAUD . . . . . . . . . . . . . . . . 48

B. USE OF THE WIRES . . . . . . . . . . . . . . . . . . 48

COUNTS TWENTY-FIVE THROUGH TWENTY-SIX
[18 U.S.C. § 1956(a)(2)(A)]
[International Promotional Money Laundering] . . . . . . . . 51

COUNTS TWENTY-SEVEN THROUGH THIRTY-TWO
[18 U.S.C. § 1956(a)(1)(B)(i)]
[Concealment Money Laundering] . . . . . . . . . . . . . . . 53

ADDITIONAL SENTENCING ENHANCEMENTS
[18 U.S.C. § 3147]
[Commission of Offense While on Pretrial Release] . . . . . . 56

FORFEITURE ALLEGATION ONE
[18 U.S.C. § 981(a)(1)(C), 28 U.S.C. § 2461(c), and
18 U.S.C. § 982(a)(2)]
[Criminal Forfeiture of Proceeds Obtained From
Conspiracy, Securities Fraud, and Wire Fraud] . . . . . . . . 57

FORFEITURE ALLEGATION TWO
[18 U.S.C. § 981(a)(1)(A), 28 U.S.C. § 2461(c), and
18 U.S.C. § 982(a)(1)]
[Criminal Forfeiture of Property Involved in Money
Laundering] . . . . . . . . . . . . . . . . . . . . . . 59

## INTRODUCTORY ALLEGATIONS

A. SUMMARY OF THE FRAUD

1. Beginning on a date unknown to the Grand Jury but at least as early as in or about July 2009, and continuing through at least in or about January 2013, within the Central District of California and elsewhere, defendants SHERMAN MAZUR ("MAZUR"), ARI KAPLAN ("KAPLAN"), GROVER HENRY COLIN NIX IV, also known as ("aka") "Colin Nix" ("NIX"), REGIS POSSINO ("POSSINO"), EDON MOYAL ("MOYAL"), MARK HARRIS ("HARRIS"), JOSEPH DAVIS, aka "Joey Davis" ("DAVIS"), CURTIS PLATT ("PLATT"), and DWIGHT BRUNOEHLER ("BRUNOEHLER") (collectively "defendants"), together with others known and unknown to the Grand Jury, perpetrated a multimillion-dollar scheme to fraudulently inflate the prices and trading volumes of public company stocks and then sell millions of shares of those companies at the fraudulently inflated prices to the investing public for substantial profits.

B. THE DEFENDANTS

2. At all times relevant to this Indictment:

a. Defendant MAZUR resided in Los Angeles, California. Defendant MAZUR controlled, among other companies and entities, London Finance Group, Ltd. ("London Finance Group").

b. Defendant KAPLAN resided in Venice, California. Defendant KAPLAN was defendant MAZUR's nephew, as well as his business partner at London Finance Group.

c. Defendants MAZUR and KAPLAN together controlled various companies and entities, including but not limited to Dojo Enterprises, LLC ("Dojo"), Picasso, LLC ("Picasso"), Burton

Partners, LLC ("Burton Partners"), Aramis Investments, LLC ("Aramis"), NVO, LLC ("NVO"), and RTO Solutions, LLC ("RTO").

d. Defendant NIX resided in Los Angeles, California. Defendant NIX controlled, among other companies and entities, Calbridge Capital, LLC ("Calbridge Capital"), which purported to be a "boutique investment banking firm" in Santa Monica, California.

e. Defendant POSSINO resided in Pacific Palisades, California. Until in or about May 2012, defendant POSSINO was defendant NIX's business partner at Calbridge Capital.

f. Defendants NIX and POSSINO controlled, among other companies and entities, Wellington Manor Holdings, Inc. ("Wellington Manor").

g. Defendant MOYAL resided in Carlsbad, California. Defendant MOYAL controlled, among other companies and entities, 8 Sounds, Inc. ("8 Sounds").

h. Defendant HARRIS resided in Scottsdale, Arizona. Defendant HARRIS was a stock promoter who controlled Apache Capital, LLC ("Apache Capital"), an investor relations firm in Scottsdale, Arizona.

i. Defendant DAVIS resided in Los Angeles and Malibu, California. Defendant DAVIS controlled Scripted Consulting Group ("Scripted Consulting"), a public relations firm in Los Angeles, California.

j. Defendant PLATT resided in Sarasota, Florida. Defendant PLATT controlled Big Dog International, LLC ("Big Dog").

///

k. Defendant BRUNOEHLER resided in Maitland, Florida. Beginning in or about June 2011, defendant BRUNOEHLER was the Chief Executive Officer ("CEO") and a Director of Biostem U.S. Corporation ("Biostem").

C. <u>UNINDICTED CO-CONSPIRATORS</u>

3. At all times relevant to this Indictment:

a. Unindicted Co-Conspirator 1 resided in The Netherlands and controlled, among other entities and companies, Satellite Newspapers Corporation ("Satellite Newspapers"), Genmed Holding Corporation ("Genmed"), and Espai D'Art Grup, S.L. ("Espai").

b. Unindicted Co-Conspirator 2 resided in Melville, New York. Unindicted Co-Conspirator 2 was a hedge fund manager who controlled Emerald Asset Advisors, LLC ("Emerald"), a hedge fund with offices in Cold Spring Harbor, New York.

c. Unindicted Co-Conspirator 3 resided in Switzerland and Dubai. Unindicted Co-Conspirator 3 was an investment manager who controlled funds and securities in foreign bank and brokerage accounts, including but not limited to bank and brokerage accounts in Switzerland and bank accounts in Liechtenstein.

d. Unindicted Co-Conspirator 4 resided in East Meadow, New York. Unindicted Co-Conspirator 4 was a broker at Legend Securities, Inc. in New York, New York.

D. <u>THE MANIPULATED STOCKS</u>

4. At all times relevant to this Indictment:

a. Genmed was a Nevada corporation with offices in Zoetermeer, The Netherlands. Genmed purported to develop, manufacture, and distribute generic pharmaceutical products in

Europe and the Middle East. Genmed was alternatively quoted on the Over-The-Counter Bulletin Board ("OTCBB") and the OTCQB under the ticker symbol "GENM."

b. Biostem was a Nevada corporation with offices in Clearwater, Florida. Biostem purported to develop and license regenerative medicine technologies, including hair regrowth technology. Biostem stock was alternatively quoted on the OTCBB and the OTCQB and began trading on or about February 2, 2010. Biostem was initially traded under the ticker symbol "BOSM," which was later changed to "HAIR."

E. <u>SECURITIES ENFORCEMENT, LAWS, REGULATIONS, RULES, AND MARKETS</u>

5. At all times relevant to this Indictment:

a. The United States Securities and Exchange Commission ("SEC") was an agency within the executive branch of the United States government. The SEC enforced federal securities laws, regulations, and rules governing the public reporting of information about publicly traded companies. Among other things, the purposes of these laws, regulations, and rules were:

i. To disclose to the investing public all material facts regarding the offer, purchase, and sale of public company stocks; and

ii. To protect the investing public by maintaining fair and honest securities markets and prohibiting manipulative practices that tend to distort the fair market prices of stocks.

b. These securities laws, regulations, and rules required the following, among other things:

i. Individuals and entities that controlled more than a certain percentage of a company's shares had to report their control of those shares to the SEC. Under certain circumstances, individuals and entities subject to this requirement also had to report any change in their beneficial ownership of the company's shares. The reporting company was also required to disclose in filings with the SEC certain individuals and entities that held more than a certain percentage of the company's shares. One purpose of these requirements was to enable potential investors in the company to accurately evaluate the degree of centralization of the company's shares and the identities of individuals who could exercise influence over the company and its shares.

ii. In certain circumstances, individuals and entities that were paid to promote or recommend a company's stock to the investing public were required to disclose to the SEC the type, amount, and source of the compensation that they received. Additionally, in certain circumstances, a publicly traded company that paid a promoter to promote or recommend the company's stock had to disclose the terms of the promoter's engagement in the company's public filings with the SEC, including any compensation that was paid to the promoter.

c. The Financial Industry Regulatory Authority ("FINRA") was an independent regulator for securities firms doing business in the United States. FINRA oversaw brokerage firms and wrote and enforced rules governing their conduct.

d. The OTCBB was a regulated quotation service operated by FINRA that showed real-time quotes, last-sales prices, and trading volume information for securities not listed on a national securities exchange. The OTCQB was a marketplace operated by OTC Markets Group Inc. that showed real-time quotes and trading volume information for OTC-traded companies. Companies quoted on the OTCBB and on the OTCQB were subject to periodic filing requirements with the SEC or other regulatory authorities.

F. MARKET MANIPULATION SCHEMES

6. Market manipulation schemes known as "pump and dump" schemes involve fraudulently inflating the price and trading volume of public company stocks and then selling those stocks at the fraudulently inflated prices to the investing public for a profit. There are generally three phases to a pump and dump scheme:

a. First, obtaining and concealing control of a significant portion of a publicly traded company's stock;

b. Second, fraudulently inflating the price and trading volume of the company's stock through a variety of means; and

c. Third, once the price of the stock has been fraudulently inflated, selling the stock at the fraudulently inflated price, thereby profiting at the expense of the investing public.

///

///

1. <u>First Phase: Obtaining and Concealing Control and Ownership of a Public Company's Free Trading Shares</u>

7. During the first phase, the perpetrators of a pump and dump scheme obtain control over a substantial portion of the free trading shares of a publicly traded company. Generally, "free trading" shares are shares of stock that the shareholder can trade without restriction. After they have acquired control over a substantial portion of the company's free trading shares, the perpetrators are poised to profit from selling those shares as soon as the price and trading volume of the company's stock have been fraudulently inflated.

8. The perpetrators of a pump and dump scheme usually take steps to conceal from the investing public their control over a substantial portion of the company's free trading shares. Ordinarily, the perpetrators would have to disclose their control of the company's stock to the public, to comply with the rules and regulations requiring disclosure of the identities of all shareholders who own or control more than a certain percentage (usually five percent) of the company's stock. For that reason, among others, the perpetrators of a pump and dump scheme often hide their control over the company's stock by purporting to transfer ownership of the shares to various nominee entities and individuals whom they, in fact, control. Accordingly, even if they do not hold the shares in their own names, the perpetrators maintain their actual control over disposition of the shares.

2. <u>Second Phase: Fraudulently Inflating the Price and Trading Volume of the Company's Stock</u>

9. During the second phase, the perpetrators fraudulently inflate the price and trading volume of the company's stock. The

perpetrators typically use some or all of the following methods to generate interest in the company and fraudulently raise the price and trading volume of the company's stock:

a. The perpetrators buy shares of the company's stock on the open market shortly before launching a promotion campaign (a technique known as "priming the pump"), to raise the price of the stock and create the false appearance that there is an increased market demand for the stock.

b. Using accounts that they control (either in their own names or in the names of nominees), the perpetrators buy and sell the company's stock back and forth among themselves, often at increasingly higher prices (a technique known as "cross trading"), to create the false appearance that there is a high market demand for the stock.

c. The perpetrators pay stock promoters and analysts to recommend the company's stock to the investing public. The promoters recommend the stock through a variety of methods, including mass mailings and emails, internet chat rooms, television and internet advertising, celebrity endorsements, boiler room operations and telemarketers, and other media outlets. The analysts, who often purport to offer independent and unbiased analysis of the company's stock to the investing public, tout the stock as underpriced, issue "buy" recommendations, and set unrealistically high target prices for the stock.

d. The perpetrators, often including complicit officers at the company, issue false and misleading press releases to generate investor interest in the company's stock,

including statements that inflate the company's projected revenues and expected earnings; exaggerate the nature and scope of business activities and operations; and misrepresent intentions to hire additional employees and develop new products.

3. Third Phase: Coordinated Selling of the Company's Stock

10. During the third phase, the perpetrators sell their shares of the company's stock in coordination to maximize their fraudulent profits from the scheme. This coordinated selling often causes the price of the stock to drop significantly, leaving investors who were deceived into buying the company's stock at the fraudulently inflated price holding shares worth substantially less than what the investors had paid for them.

///

///

///

COUNT ONE

[Defendants MAZUR, KAPLAN, NIX, POSSINO, MOYAL, HARRIS, DAVIS, PLATT, and BRUNOEHLER]

[18 U.S.C. § 371]

[Conspiracy]

11. The Grand Jury hereby realleges and incorporates by reference paragraphs 1 through 10 of this Indictment as though fully set forth herein.

A. THE OBJECTS OF THE CONSPIRACY

12. Beginning on a date unknown to the Grand Jury but at least as early as in or about July 2009, and continuing through at least in or about January 2013, in Los Angeles and Orange Counties, within the Central District of California, and elsewhere, defendants MAZUR, KAPLAN, NIX, POSSINO, MOYAL, HARRIS, DAVIS, PLATT, and BRUNOEHLER, together with others known and unknown to the Grand Jury, knowingly combined, conspired, and agreed to commit the following offenses against the United States:

a. Securities fraud, in violation of Title 18, United States Code, Section 1348(1);

b. Securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5; and

c. Wire fraud, in violation of Title 18, United States Code, Section 1343.

///

///

B. <u>THE MANNER AND MEANS OF THE CONSPIRACY</u>

13. The objects of the conspiracy were carried out, and to be carried out, in substance, as follows:

1. <u>Obtaining and Concealing Control and Ownership of the Manipulated Companies' Free Trading Shares</u>

14. Defendants MAZUR, KAPLAN, and PLATT, together with others known and unknown to the Grand Jury, including but not limited to Unindicted Co-Conspirator 1, identified publicly traded companies that would be suitable candidates for fraudulent market manipulation campaigns (hereinafter "manipulation campaigns"), and then took steps to obtain secret control over all, or a substantial portion, of those companies' free trading shares, through the following methods, among others:

a. Defendants MAZUR, KAPLAN, and PLATT, along with others known and unknown to the Grand Jury, arranged with the majority owners of the companies to obtain all or a substantial portion of the companies' free trading shares; and

b. Defendants MAZUR, KAPLAN, PLATT, and BRUNOEHLER, and Unindicted Co-Conspirator 1, along with others known and unknown to the Grand Jury, arranged with the companies to have shares issued to entities that were controlled by defendants MAZUR, KAPLAN, and PLATT.

15. In some instances, defendants MAZUR, KAPLAN, PLATT, and BRUNOEHLER were not able to obtain all or substantially all of the companies' free trading shares from individuals or entities who owned or controlled shares of the company. In those instances, defendants MAZUR, KAPLAN, PLATT, and BRUNOEHLER took the following steps, among others, to prevent uncooperative

shareholders from selling their shares during the manipulation campaigns and interfering with the success of the manipulation campaigns:

a. Defendants MAZUR, KAPLAN, PLATT, and BRUNOEHLER purchased, caused to be purchased, and attempted to purchase shares from uncooperative shareholders;

b. Defendants MAZUR, KAPLAN, PLATT, and BRUNOEHLER negotiated and attempted to negotiate "lock-up agreements" with the uncooperative shareholders that limited the ability of those shareholders to sell their shares for a certain time period; and

c. Defendants MAZUR, KAPLAN, PLATT, and BRUNOEHLER planned and executed "reverse stock splits" of the companies' stocks, which substantially reduced the total number of outstanding shares of the manipulated companies, and in turn, the amount of shares held by the uncooperative shareholders. After executing the reverse stock splits, defendants MAZUR, KAPLAN, and BRUNOEHLER often caused the companies to issue new shares to nominee entities and individuals that defendants MAZUR, KAPLAN, and BRUNOEHLER controlled, which substantially reduced the overall percentage of shares of the companies' stock held by the uncooperative shareholders and the ability of those shareholders to disrupt the planned manipulation campaigns.

16. Defendants MAZUR and KAPLAN and Unindicted Co-Conspirator 1 transferred shares to nominee entities and individuals who were controlled by other conspirators, including but not limited to defendants NIX, POSSINO, and DAVIS, and Unindicted Co-Conspirator 2, as compensation for their participation in the conspiracy.

17. Defendants MAZUR, KAPLAN, NIX, POSSINO, DAVIS, and PLATT, and Unindicted Co-Conspirator 2, together with others known and unknown to the Grand Jury, took steps to conceal their ownership of the manipulated companies' stocks by, among other things, transferring shares to nominee entities and individuals that they controlled, including but not limited to London Finance Group, Dojo, Picasso, Burton Partners, NVO, Calbridge Capital, Scripted Consulting, and Big Dog.

18. After they had obtained control of the free trading shares, defendants MAZUR, KAPLAN, PLATT, and BRUNOEHLER, together with Unindicted Co-Conspirator 1 and others known and unknown to the Grand Jury, arranged for the publicly traded companies to acquire private companies and assets which would appear to provide the publicly traded companies with attractive future business prospects. In this process, defendants MAZUR, KAPLAN, PLATT, and BRUNOEHLER, and Unindicted Co-Conspirator 1, focused on companies that they believed would be most likely to attract interest from investors, such as companies purportedly involved in pharmaceuticals, hair restoration, oil and gas development, and green technologies.

19. Before beginning campaigns to fraudulently manipulate the prices of publicly traded companies' stocks, including but not limited to the stock of Biostem, defendants MAZUR, KAPLAN, PLATT, and BRUNOEHLER also planned and executed "forward stock splits" of the companies' stocks, which substantially increased the total number of outstanding shares of those companies' stocks that they collectively controlled and could sell to the investing public during the planned manipulation campaigns.

2. <u>Fraudulently Inflating the Price and Trading Volume of the Manipulated Companies' Stocks</u>

20. After obtaining secret control of all or a substantial portion of the manipulated companies' free trading shares, defendants MAZUR, KAPLAN, NIX, POSSINO, MOYAL, HARRIS, DAVIS, PLATT, and BRUNOEHLER, together with Unindicted Co-Conspirators 1, 2, 3, and 4 and others known and unknown to the Grand Jury, used the following methods, among others, to generate interest in the companies and fraudulently inflate the price and trading volume of the companies' shares:

a. Defendants MAZUR, KAPLAN, NIX, and POSSINO, and Unindicted Co-Conspirators 2, 3, and 4, together with others known and unknown to the Grand Jury, purchased and caused the purchase of shares of the companies on the open market shortly before the promotion campaigns were launched. To the investing public, these trades appeared to be purchases by investors not affiliated with the companies, and gave the false appearance that there was an increasing market demand for the shares. Defendants MAZUR, NIX, and POSSINO, and Unindicted Co-Conspirator 4, also purchased and caused the purchase of shares of the companies on the open market shortly before the end of the trading period on certain dates. These trades had the effect of, and were intended to, artificially raise the closing price of the company's stock, making it appear to be worth more to investors than it actually would have been absent such trades (a manipulation technique sometimes referred to as "marking the close").

b. Defendants MAZUR, KAPLAN, NIX, POSSINO, MOYAL, HARRIS, DAVIS, PLATT, and BRUNOEHLER, and Unindicted Co-

Conspirators 1, 2, and 3, together with others known and unknown to the Grand Jury, fraudulently promoted the companies' stocks through the following means, among others:

i. Paying stock promoters, including defendants HARRIS and DAVIS, to tout the companies' performance and prospects, including through mass emails and mailings, television and Internet advertisements, video news releases ("VNRs"), celebrity endorsements, promotional events, infomercials, and other media outlets;

ii. Giving, and offering to give, defendants NIX and MOYAL and Unindicted Co-Conspirators 2 and 3, as well as others known and unknown to the Grand Jury, shares of the companies, or a portion of the profits from the manipulation campaigns, in exchange for assisting the manipulation campaigns; and

iii. Paying stock analysts and recommendation websites, many of which purported to offer independent and unbiased analyses of companies' stocks, to recommend the companies as favorable investments. Defendants MAZUR, KAPLAN, NIX, POSSINO, MOYAL, and HARRIS took steps to conceal from the public that they were the source of the funds paid to these stock analysts and recommendation websites.

c. Defendants MAZUR and KAPLAN, and Unindicted Co-Conspirator 1, worked with certain officers at the companies, including but not limited to defendant BRUNOEHLER, to issue press releases that defendants MAZUR, KAPLAN, NIX, POSSINO, MOYAL, HARRIS, PLATT, and BRUNOEHLER knew contained material false and misleading information, and omitted material information

necessary to make the press releases not false and misleading, regarding:

i. The manipulated companies' business operations, products and technologies that the companies had supposedly developed or were developing, hiring of new employees, projected earnings, and growth potential;

ii. The defendants' ownership and control, through various nominees, of a substantial portion of the free trading shares of the manipulated companies' stocks;

iii. The defendants' payments to promoters to tout the manipulated companies' stocks;

iv. The defendants' manipulation of the price and trading volume of the manipulated companies' stocks; and

v. The defendants' intention to sell their shares of the manipulated companies' stocks at the same time that they were paying promoters to encourage the investing public to buy and hold shares of those companies' stocks.

21. Defendants MAZUR and KAPLAN typically executed and caused the execution of multiple promotion campaigns for the same company's stock over extended periods of time.

3. <u>Coordinated Selling of the Manipulated Companies' Stocks</u>

22. After fraudulently inflating the prices and trading volumes of the manipulated companies' stocks, defendants MAZUR, KAPLAN, NIX, POSSINO, DAVIS, and PLATT, and Unindicted Co-Conspirator 2, together with others known and unknown to the Grand Jury, sold their shares to unsuspecting victim investors at the fraudulently inflated prices, thereby generating substantial

illegal proceeds. Defendants MAZUR, KAPLAN, NIX, and POSSINO, together with others known and unknown to the Grand Jury, also transferred, and caused to be transferred, proceeds from selling the shares to accounts in the names of nominee entities and individuals, as well as to other conspirators, including but not limited to defendant MOYAL.

23. Defendants and their co-conspirators generated at least $13,000,000 in illegal proceeds from selling their shares of the manipulated companies. This included, but was not limited to, at least $2,100,000 in illegal proceeds from the manipulation campaign for Genmed, as well as $500,000 in illegal proceeds from the ongoing manipulation campaign for Biostem.

C. <u>OVERT ACTS</u>

24. In furtherance of the conspiracy and to accomplish its objects, defendants MAZUR, KAPLAN, NIX, POSSINO, MOYAL, HARRIS, DAVIS, PLATT, and BRUNOEHLER, together with others known and unknown to the Grand Jury, committed, willfully caused others to commit, and aided and abetted the commission of the following overt acts, among others, in the Central District of California and elsewhere:

1. <u>Overt Acts Regarding Genmed</u>

<u>Overt Act 1</u>: On or about December 16, 2010, defendant MAZUR and Unindicted Co-Conspirator 1 caused the transfer of approximately 3,700,000 shares of Genmed from Espai to London Finance Group.

<u>Overt Act 2</u>: On or about January 14, 2011, defendants MAZUR and NIX and Unindicted Co-Conspirator 1 caused the transfer

of approximately 1,000,000 shares of Genmed from Unindicted Co-Conspirator 1 to Calbridge Capital.

Overt Act 3: On or about January 20, 2011, Unindicted Co-Conspirator 1 caused the dissemination of a press release announcing that Genmed had entered into an agreement with an unnamed pharmaceutical distributor in Ireland to distribute Genmed's products in several countries, with initial distribution to begin in the second fiscal quarter of 2011.

Overt Act 4: On or about January 21, 2011, defendants NIX and HARRIS caused a wire transfer of approximately $40,000 from Calbridge Capital to Apache Capital for the purpose of promoting Genmed stock.

Overt Act 5: On or about January 24, 2011, defendants NIX and HARRIS caused a wire transfer of approximately $49,975 from Calbridge Capital to Apache Capital for the purpose of promoting Genmed stock.

Overt Act 6: On or about February 3, 2011, defendants NIX and POSSINO caused a wire transfer of approximately $29,975 to a third party stock promotion group for the purpose of promoting Genmed stock.

Overt Act 7: On or about February 14, 2011, defendants MAZUR and NIX and Unindicted Co-Conspirator 1 caused the transfer of approximately 1,400,000 shares of Genmed stock from Espai to Calbridge Capital.

Overt Act 8: On or about March 2, 2011, defendants NIX and POSSINO, using a brokerage account in the name of Calbridge Capital, sold approximately 578,386 shares of Genmed stock.

Overt Act 9: On or about March 3, 2011, defendants MAZUR, KAPLAN, and DAVIS caused the transfer of approximately $29,000 from Dojo to Scripted Consulting for the purpose of promoting Genmed stock.

Overt Act 10: On or about March 4, 2011, defendants NIX and POSSINO caused the transfer of approximately $14,970 from Wellington Manor to a third party stock analyst ("Analyst A") for the purpose of recommending Genmed stock as a favorable investment.

Overt Act 11: On or about March 15, 2011, defendants NIX, MOYAL, and HARRIS caused the transfer of approximately $125,000 from 8 Sounds to Wellington Manor, and then $124,970 from Wellington Manor to Apache Capital, for the purpose of promoting Genmed stock.

Overt Act 12: On or about March 16, 2011, defendant HARRIS caused the transfer of approximately $125,000 from Apache Capital to a stock promotion group in Canada for the purpose of promoting Genmed stock.

Overt Act 13: On or about March 16, 2011, defendant HARRIS told defendant NIX that he had sent the money to a stock promotion group the day before. Defendant NIX told defendant HARRIS that defendant NIX would send "the other 15 [meaning $15,000] to you by Friday," as well as "the 10 [i.e., $10,000] for [Analyst A] as well."

Overt Act 14: On or about March 16, 2011, defendant NIX told defendant KAPLAN that defendant NIX was getting materials from Analyst A. Defendant NIX told defendant KAPLAN that "we should sit down and go through everything" and "go over all the

price targets" to make sure that defendant KAPLAN did not get "any flack" from Unindicted Co-Conspirator 1. Defendant NIX also indicated to defendant KAPLAN that he would send out another "320 grand" to promote Genmed and told defendant KAPLAN to talk with defendant MAZUR about getting defendant NIX a stock purchase agreement (for additional Genmed shares).

Overt Act 15: On or about March 16, 2011, defendants NIX and POSSINO discussed potentially delaying the next round of promotion for Genmed. Defendant POSSINO told defendant NIX that "if we put it out for one more week, we have another dead week here there's nothing coming in." Defendant NIX responded that "if we launch Tuesday and I don't have the paper [meaning shares of Genmed], what's the point?"

Overt Act 16: On or about March 20, 2011, defendant NIX sent a string of five text messages to defendant HARRIS stating, collectively:

> I am emailing u ... a bunch of materials on genm which u can forward to [Analyst A]. I believe these items I [am] forwarding will help support [t]he increase in price target. Pls forward on to appropriate parties. ... also as mentioned the company has done a VNR (video news release) like [an] infomercial ... With a known actor endorsing the company and such ... It will be aired across all media like CNN Bloomberg, msnbc, local tv as well as cable across the nation. As well as English speaking European countries. It should be done this week ... I believe it will [be] a great tool for [the third party stock promotion groups].

Overt Act 17: Between on or about March 21, 2011, and on or about March 25, 2011, Unindicted Co-Conspirator 3, using accounts that he controlled at Zuercher Kantonalbank and Aargauische Kantonal Bank in Switzerland, caused the purchase of approximately 416,300 shares of Genmed.

<u>Overt Act 18</u>: On or about March 22, 2011, defendants MAZUR and NIX discussed a VNR that had been done by a well-known actor ("Actor A") recommending Genmed as an attractive investment. Defendant MAZUR asked defendant NIX whether defendant NIX had provided the most recent version of the VNR to Unindicted Co-Conspirator 3, and defendant NIX said that he had sent it and that Unindicted Co-Conspirator 3 liked the VNR. Defendant MAZUR said that Actor A was "believable," and defendant NIX said "I love how [Actor A] opens up and says, you know, 'I was in a car accident or motorcycle accident' ... it's a great intro" and that Actor A "comes off as very believable."

<u>Overt Act 19</u>: On or about March 23, 2011, defendant MAZUR told defendant NIX that Actor A was going to be on the television program Access Hollywood promoting Genmed and "the VNR is going to be running in the background." Defendant MAZUR said that the appearance would be seen by approximately "4.7 million viewers." Defendant NIX told defendant MAZUR that another analyst ("Analyst B") was going to set a target price of $1.74 for Genmed, a price that was approximately 1,200 percent higher than the stock's then-current price. Defendant NIX said that he would send Analyst B's draft report to defendant MAZUR.

<u>Overt Act 20</u>: On or about March 23, 2011, defendants MAZUR and NIX discussed the large disparity between the target prices that Analysts A and B were going to set for Genmed stock. Defendant NIX said "I don't want to have two conflicting, you know, so out of whack price targets ... from ... 40 cents or whatever to 2 dollars, I mean, that's insane." Defendant NIX said that such a disparity in target prices from analysts would

cause potential investors to question the recommendations. Defendant NIX told defendant MAZUR that defendant MAZUR's previous suggestion that Analyst A give a "buy recommendation," instead of setting a low target price, in order to avoid such a disparity was a "brilliant idea." Defendant NIX said that they could bring Analyst B's target price down instead, but that he did not think that was the best approach.

Overt Act 21: On or about March 23, 2011, defendants MAZUR and NIX and Unindicted Co-Conspirator 1 caused the public dissemination of an analyst report from Analyst A projecting approximately $40 million in sales for Genmed in 2012 and recommending Genmed as an attractive investment.

Overt Act 22: On or about March 24, 2011, defendant NIX told defendant KAPLAN that distribution lists (i.e., of potential investors) that had been used for a different deal "have all been booked for our little deal called Genmed," and said "I'm fucking truly excited like a kid at Christmas to see how this goes off." Defendant KAPLAN told defendant NIX "this will be fucking good." Defendant NIX asked defendant KAPLAN when defendant NIX would receive additional Genmed shares, and defendant KAPLAN told defendant NIX that it was not his decision and that defendant MAZUR was "in the driver's seat on this one."

Overt Act 23: On or about March 24, 2011, during a meeting with defendant MAZUR about receiving additional shares in exchange for coordinating the promotion of Genmed stock, defendant NIX called defendant MOYAL and told him that (a) defendant MAZUR had given five million shares of Genmed stock to the transfer agent; (b) out of those five million shares,

defendant MAZUR had to give one million shares to the person who had done the VNR with Actor A; (c) defendant MAZUR wanted to keep two million shares of Genmed for himself and give two million shares of Genmed to defendants NIX and MOYAL; and (d) defendant MAZUR said that Unindicted Co-Conspirator 1 did not want to give as much as four million shares to defendant NIX because defendant NIX had already sold all of the shares that he had previously received from them.

Overt Act 24: On or about March 24, 2011, after meeting with defendant MAZUR, defendant NIX told defendant MOYAL that defendant MAZUR was going to give them three million additional shares of Genmed stock. Defendant NIX told defendant MOYAL that selling three million shares of Genmed stock at approximately $0.20 per share would result in approximately $600,000 in proceeds. Defendants NIX and MOYAL then calculated their costs in funding the campaign and their available shares of Genmed, and defendant NIX estimated that defendant MOYAL's ultimate profit on the deal would be around "three, four hundred grand." Defendant MOYAL concluded "300 grand would be fine."

Overt Act 25: On or about March 24, 2011, defendant MAZUR told defendant NIX that he had spoken with Unindicted Co-Conspirator 1, and that the deal was that defendant NIX would receive three million shares and another million shares the following week. Defendant MAZUR told defendant NIX that, in return, Unindicted Co-Conspirator 1 wanted defendants NIX and MOYAL to commit, in writing, to funding six weeks of promotion for Genmed "for the shares you've already received plus the four million that you're getting."

<u>Overt Act 26</u>: On or about March 24, 2011, defendant NIX told defendant POSSINO that defendant MAZUR "wanted ... me to write a letter, saying that we're committed to fund six weeks of [two stock promotion groups] for the four million shares. I was like, you're out of your fucking mind. Never gonna happen." Defendant NIX said that it would be "ridiculous" to put that agreement in writing. Defendant POSSINO said, "yeah, break into prison while you're at it," and defendant NIX responded, "exactly."

<u>Overt Act 27</u>: On or about March 24, 2011, defendant NIX told defendant MOYAL that defendant MAZUR wanted defendants NIX and MOYAL to put in writing that they were committed to paying two stock promotion groups to promote Genmed for six weeks in exchange for the four million shares. Defendant NIX told defendant MOYAL that he was willing to get on the phone and verbally make that commitment to defendant MAZUR, but that he would not be "putting anything in writing because I'm fucking moving paper [meaning selling shares], I'm not putting anything in writing that I'm hiring these people." Defendant MOYAL responded, "yeah, screw that."

<u>Overt Act 28</u>: Between on or about March 25, 2011, and on or about April 5, 2011, defendants MAZUR and KAPLAN, using an account in the name of London Finance Group, caused the sale of approximately 601,380 shares of Genmed.

<u>Overt Act 29</u>: On or about March 28, 2011, defendants MAZUR and NIX and Unindicted Co-Conspirator 1, caused the transfer of approximately three million shares of Genmed stock from Espai to Calbridge Capital.

Overt Act 30: Between on or about March 28, 2011, and on or about April 4, 2011, defendants NIX, POSSINO, and HARRIS caused at several stock promotion websites to tout Genmed as a favorable investment.

Overt Act 31: On or about March 28, 2011, defendant NIX discussed with defendant KAPLAN the fact that Actor A would be appearing on Access Hollywood the next day, and told defendant KAPLAN to tell Actor A "to fucking put that symbol [meaning the ticker symbol for Genmed] out there" during the appearance. Defendants NIX and KAPLAN discussed how high the promotion would increase Genmed's stock price, and defendant KAPLAN said that the stock "could hit fifty cents by the end of the day." Defendant KAPLAN told defendant NIX not to block the stock's momentum by selling too many shares and reminded defendant NIX that he did not "have to gobble up every trade."

Overt Act 32: On or about March 29, 2011, defendant NIX told defendant KAPLAN that he needed a press release from Genmed to be issued the next day. Defendant KAPLAN told defendant NIX that he did not have any press releases "in the can" and that he would need approval from the company for any new press release. Defendant NIX told defendant KAPLAN, "write one up or have [defendant DAVIS] write one up." Defendant KAPLAN asked defendant NIX what the press release should be about, and defendant NIX responded "do it on the general industry, I don't give a fuck. Something."

Overt Act 33: On or about March 29, 2011, defendants KAPLAN and NIX discussed potential announcements that Genmed could issue in a press release. Defendant NIX suggested that

defendant DAVIS could issue a press release announcing that Genmed has signed a "global advertising agreement" with defendant DAVIS' company, Scripted Consulting.

Overt Act 34: On or about March 30, 2011, defendants KAPLAN, NIX, and DAVIS, and Unindicted Co-Conspirator 1, caused the public dissemination of a press release announcing "GENMED SELECTS SCRIPTED CONSULTING AS GLOBAL MARKETING AND PUBLIC RELATIONS AGENCY OF RECORD."

Overt Act 35: Between on or about March 31, 2011, and on or about April 4, 2011, defendants NIX and POSSINO, using a brokerage account in the name of Calbridge Capital, caused the sale of approximately 1,563,499 shares of Genmed stock.

Overt Act 36: On or about April 5, 2011, defendants MAZUR, KAPLAN, and DAVIS, and Unindicted Co-Conspirator 1, caused the public dissemination of a VNR in which Actor A touted Genmed as a favorable investment.

Overt Act 37: On or about April 5, 2011, shortly before the stock market was scheduled to close for the day, defendant MAZUR instructed defendant NIX to direct Unindicted Co-Conspirator 4 to buy 100,000 shares of Genmed to increase the price up to $0.16 before the market closed for the day. Defendant MAZUR told defendant NIX "give it a kick in the ass at the end here."

Overt Act 38: On or about April 5, 2011, shortly before the stock market was scheduled to close for the day, defendant MAZUR told defendant NIX, "what I'm suggesting you do ... is you go in and have [Unindicted Co-Conspirator 4] clean this thing up to 16 [meaning $0.16 per share] so it looks like it bounced back,

so if [two stock promotion groups] go again tomorrow, ... then maybe this thing will pop again." Defendant MAZUR told defendant NIX "you got four minutes."

Overt Act 39: On or about April 5, 2011, defendant NIX instructed Unindicted Co-Conspirator 4 to use defendant NIX's brokerage account to buy 5,000 shares of Genmed at $0.13, then another 5,000 shares at $0.14, and then another 5,000 shares at $0.14. Defendant NIX then instructed Unindicted Co-Conspirator 4 to buy another 10,000 shares of Genmed at 14, and stated "hurry, you only have 30 seconds." Unindicted Co-Conspirator 4 confirmed to defendant NIX that those orders to buy Genmed stock had been completed.

Overt Act 40: On or about April 8, 2011, defendant NIX asked defendant MOYAL what entity they should cause to be listed on the disclaimer by one of the stock promoters whom they were paying to tout Genmed stock as a favorable investment. Defendant MOYAL told defendant NIX that he did not want the disclaimer in his company's name, meaning that defendant MOYAL did not want the disclaimer to reveal that defendant MOYAL had paid the stock promoter to tout Genmed stock. Defendant NIX told defendant MOYAL that defendant NIX would have the disclaimer reflect that the payment came from Wellington Manor, and defendant MOYAL replied, "Wellington's fine."

Overt Act 41: On or about April 11, 2011, defendant MOYAL told defendants MAZUR and NIX that they would watch the first hour of the promotion campaign for Genmed the following day, and then coordinate together about how much Genmed stock they should sell.

Overt Act 42: Between on or about April 11, 2011, and on or about April 18, 2011, defendant DAVIS, using an account in the name of Scripted Consulting, caused the sale of approximately 345,000 shares of Genmed.

Overt Act 43: Between on or about April 12, 2011, and on or about April 15, 2011, defendants NIX and POSSINO, using a brokerage account in the name of Calbridge Capital, caused the sale of approximately 1,482,000 shares of Genmed stock.

Overt Act 44: On or about June 21, 2011, Unindicted Co-Conspirator 2 told defendant Kaplan that he had told a particular stock promoter that defendants KAPLAN and MAZUR had 17 million shares of Genmed and needed to come out at "a decent level," meaning that they needed to sell their Genmed stock at a higher stock price than Genmed's current stock price. Defendant KAPLAN told Unindicted Co-Conspirator 2 that he wanted to move the stock price from $0.07 or $0.08, where it was currently trading, up to $0.15, and asked Unindicted Co-Conspirator 2 whether that would be difficult to accomplish. Unindicted Co-Conspirator 2 responded that the stock promoter would "come up with a plan," that the stock promoter might need more than the six million shares of compensation that they had previously discussed, and that the stock promoter would "take it [meaning Genmed's stock price] to whatever she's gotta do."

Overt Act 45: On or about July 14, 2011, defendants MAZUR and KAPLAN caused London Finance Group to transfer approximately seven million shares of Genmed to Coastal Consulting Limited.

///

Overt Act 46: On or about August 10, 2011, defendant MAZUR told defendant BRUNOEHLER that the "SEC made [Genmed] write off all their intangibles cause they have not generated 5 cents of revenue." Defendant MAZUR stated he had previously "put like 30 million dollars of value on the [Genmed] balance sheet because of the licenses [Genmed] had" to sell generic pharmaceutical products. Defendant Brunoehler replied "which was not real." Defendant MAZUR told defendant BRUNOEHLER that Unindicted Co-Conspirator 1 "admitted to me last night that 'Randy' [meaning Genmed's CFO] and ... 'Erwin' [meaning Genmed's CEO] ... lied about that to the evaluation people." Defendant MAZUR stated "if the SEC ever found out they'd be in deep shit."

Overt Act 47: On or about September 12, 2011, Unindicted Co-Conspirator 2 and defendant Kaplan discussed the progress of the Genmed manipulation campaign, including that the stock price had now traded up to between $0.07 and $0.08 per share, an increase of approximately 50 percent. Unindicted Co-Conspirator 2 verified that he was behind that increase, stated that it "had moved with relative ease" (meaning the stock price), and that he believed they'd have the stock up to at least $0.10 to $0.15 tomorrow "before it starts" (meaning the promotion), and then they'd see "more volume." Unindicted Co-Conspirator 2 stated that he would "check out this news" (meaning potential Genmed press releases) and told Kaplan "just ensure that we have that done." Kaplan affirmed that he would, and added "if there's one [meaning Genmed press release] that you like more than others, let me know."

///

<u>Overt Act 48</u>: Between on or about September 12, 2011, and on or about September 21, 2011, Unindicted Co-Conspirator 2, using a brokerage account in the name of Coastal Consulting Limited, caused the sale of approximately 2,294,700 shares of Genmed.

2. <u>Overt Acts Regarding Biostem</u>

<u>Overt Act 49</u>: On or about June 10, 2011, defendant BRUNOEHLER entered into an employment agreement with and became the CEO of Biostem.

<u>Overt Act 50</u>: On or about July 10, 2011, defendant MAZUR told defendant KAPLAN that (a) they needed to finish the Biostem consulting agreement so they could provide it to defendant BRUNOEHLER; (b) they would ask for $20,000 per month, but would settle for $10,000; (c) defendant BRUNOEHLER's "got control of the checkbook, so we know we'll get paid"; and (d) they would "take a million [shares of Biostem], earn them on a pro-rata basis."

<u>Overt Act 51</u>: On or about July 11, 2011, while describing a discussion that defendant BRUNOEHLER had had with the Chairman of the Board of Directors of Biostem, defendant BRUNOEHLER told defendant MAZUR, "I said, 'you certainly don't want [defendant PLATT] selling his stock or anybody else, do you, and knocking, you know, knocking the price down?'" Defendant MAZUR said, "we'll all come in and come out together." Defendant BRUNOEHLER responded, "there you go, there you go."

<u>Overt Act 52</u>: On or about July 12, 2011, defendant BRUNOEHLER told defendant MAZUR that "[defendant PLATT] said that he had a conversation with you [defendant MAZUR] and that you

agreed to put [Biostem shares] in one of his brokers that he knows ...." Defendant MAZUR responded, "that's fine, but you can't, you can't put that in a document ... that's almost like manipulation ... I'll deposit it wherever he wants me to deposit it, I don't give a shit ... but he can't put that in the agreement, you know, that's the kind of thing, you have a side agreement, you just do it ...."

Overt Act 53: On or about July 14, 2011, defendants MAZUR, KAPLAN, and BRUNOEHLER caused Biostem to enter into a consulting agreement with NVO, by which Biostem would pay cash and issue one million shares to NVO.

Overt Act 54: On or about July 15, 2011, in a conversation with an individual who controlled a substantial amount of Biostem shares ("Shareholder A"), defendant MAZUR told Shareholder A that Biostem was just "a shell with a lot of shares out, with nothing in it ... they've got no website other than that ... stupid website, and they've got nothing going on."

Overt Act 55: On or about July 27, 2011, after defendant PLATT recommended a third-party stock promoter for a manipulation campaign for Biostem, defendant MAZUR asked defendant PLATT, "this [stock promoter] is gonna go out there and run some sort of a campaign, is what you're telling me?" Defendant PLATT responded, "Yeah, he knows people, he's got some really solid things." Defendant MAZUR then described a process by which the stock promoter would sell Biostem stock during the manipulation campaign.

Overt Act 56: On or about August 4, 2011, in discussing Biostem, defendants MAZUR and BRUNOEHLER agreed that the company

was "worthless." Defendant MAZUR explained, "there is nothing there ... [t]here is nothing to the company," and defendant BRUNOEHLER responded "it's monkey business."

Overt Act 57: On or about August 5, 2011, in a discussion about Shareholder A, defendant PLATT told defendant MAZUR, "we gotta deal with the guy, I can't do what I'm gonna do here if he's in the way." Defendant MAZUR responded, "yeah, he'll kill it." Defendant PLATT replied, "we're pretty much ready to go, we're moving paper [i.e., Biostem stock] right now to get it set up to do what we need to do."

Overt Act 58: On or about August 10, 2011, in a discussion about Shareholder A, defendant PLATT told defendant MAZUR that Shareholder A "agreed yesterday to tie up everything like the rest of us, what we all agreed to do was put a million shares each over to my guy and tie up everything else that we own, and ... nobody could sell into [the manipulation campaign]." Defendant PLATT said that he was not going to start a promotion campaign for Biostem until they had resolved the situation with Shareholder A, stating "I'm not even putting my toe in the water on this thing until I got every share of his accounted for ... cause it's stupid, we both know what would happen ... he'd be blowing stock up my ass."

Overt Act 59: On or about August 29, 2011, defendant MAZUR told defendant PLATT that (a) they could make a deal with Shareholder A to buy his Biostem stock; or (b) they could "do a big reverse, and you go out, and, uh, all the people you wanna keep in the deal, you have everyone just buy some more stock, you just don't offer it to him, and you just get rid of him."

Overt Act 60: On or about August 29, 2011, in a discussion about Shareholder A, defendant PLATT told defendant MAZUR, "if I can get [Shareholder A] locked up, I can move 10 to 15 million dollars' worth of stock, uh, and we can all do well, and we can also accomplish our goals and it doesn't hurt a damn thing ...." Defendant MAZUR added that "you and I are on the same page," and defendant PLATT said, "we're on the same page, that's all I needed to know."

Overt Act 61: On or about September 2, 2011, defendant MAZUR told defendant KAPLAN, "I talked to [defendant PLATT], they're gonna be ready to start a week from Monday ... he's gonna swap us out, uh, 250,000 shares at a clip ... until we're done with that million shares." Defendant KAPLAN confirmed that the million shares were "in the safe."

Overt Act 62: On or about September 2, 2011, defendant MAZUR told defendant BRUNOEHLER and the Chairman of the Board of Directors of Biostem that "[Defendant PLATT] does his thing and the stock eventually ends up at ten cents ... I could show you dozens of deals where that happens, uh, there's some sort of IR/PR program, the stock trades trades trades, and then ... eventually ... it's like musical chairs, the music stops, and eventually everybody, uh, just sells their stock and wants out." Defendant MAZUR explained that after that happened, they could then "do a reverse [stock split]" and after that, "it'll be just ... the key participants, the board members, and whoever else ... you guys wanna drag along will be the shareholders going forward."

///

Overt Act 63: On or about September 7, 2011, in a discussion about the price and trading volume of Biostem stock prior to a manipulation campaign that defendant PLATT was planning, defendant MAZUR said, "I saw ... the last trade yesterday was like 51 cents or something?" Defendant PLATT said, "Yeah, that was Friday ... I did that ... just kinda inching it up a little bit. Where do you want it?" Defendant MAZUR answered, "It's not me, it's ... when [the stock promoter] is ready to get going, where does he want it?" Defendant PLATT said, "That's why I'm not shootin' my bullets yet, you know."

Overt Act 64: On or about September 21, 2011, defendant MAZUR proposed to defendant PLATT a procedure in anticipation of a manipulation campaign for Biostem: "this is, you know, what I call a 'Sherman classic,' I do this almost all the time ... the toxic convertible debenture ... the money that goes in now ... becomes senior secured, make it real short-term like six months ... you can go ahead, demand payment, of course the company's not gonna have the cash to pay, you go ahead and, uh, you convert the debenture into a billion shares, and uh, you reverse, and you're done."

Overt Act 65: On or about September 29, 2011, defendant BRUNOEHLER told defendant MAZUR that the Chairman of the Board of Directors of Biostem had invited the company's attorney to attend an upcoming board meeting. Defendant MAZUR responded, "yeah, well, [the Chairman] doesn't know what the fuck he's doing, OK? ... And I'm telling you that if you have [Biostem's attorney] there, you may put him in a position where he's gonna be conflicted, because he has an obligation to report shit once the

Board votes on it ... you may be shooting yourself in the foot." Defendant MAZUR said that he was opposed to having Biostem's attorney there because "you wanna tell your lawyer what you're doing after, and not ask him for advice on this, because ... he's gotta respond to the SEC and he has to be truthful, honest, and open, he cannot play games."

Overt Act 66: On or about October 14, 2011, defendant MAZUR told defendant BRUNOEHLER, "I just want to see how dumb these guys are ... I can go ahead and finesse a piece of paper in there that gets us control of this company [Biostem]." Defendant BRUNOEHLER stated, "I'm waiting to see it, maestro."

Overt Act 67: On or about December 17, 2011, defendants MAZUR, KAPLAN, and BRUNOEHLER caused Biostem to issue to NVO 15,000,000 shares of Biostem stock.

Overt Act 68: On or about December 22, 2011, in preparation for a manipulation campaign for Biostem, defendants MAZUR, KAPLAN, and BRUNOEHLER caused Biostem to execute a 4 to 1 forward stock split.

Overt Act 69: On or about March 1, 2012, defendant PLATT sold and caused to be sold approximately 10,000 shares of Biostem in an account in the name of Big Dog.

Overt Act 70: On or about March 21, 2012, defendant PLATT sold and caused to be sold approximately 9,050 shares of Biostem in an account in the name of Big Dog.

Overt Act 71: On or about April 27, 2012, in preparation for a manipulation campaign for Biostem, defendants MAZUR, KAPLAN, and BRUNOEHLER caused Biostem to execute a 3 to 1 forward stock split.

Overt Act 72: On or about May 30, 2012, defendants MAZUR and KAPLAN sold and caused to be sold approximately 173,000 shares of Biostem in an account in the name of Picasso.

Overt Act 73: On or about May 30, 2012, defendants MAZUR and KAPLAN sold and caused to be sold approximately 132,000 shares of Biostem in an account in the name of Burton Partners.

Overt Act 74: On or about June 4, 2012, defendants MAZUR and KAPLAN sold and caused to be sold approximately 40,252 shares of Biostem in an account in the name of Burton Partners.

Overt Act 75: On or about June 4, 2012, defendants MAZUR and KAPLAN sold and caused to be sold approximately 100,000 shares of Biostem in an account in the name of Dojo.

Overt Act 76: On or about July 11, 2012, in order to interest a third party ("Person B") in assisting a manipulation campaign for Biostem, defendant NIX told Person B that
(a) defendant MAZUR "put the deal together originally";
(b) defendant BRUNOEHLER "knows exactly what's up"; and
(c) defendants NIX and MAZUR would split the proceeds "50-50, down the middle."

Overt Act 77: On or about August 6, 2012, during a meeting with defendants KAPLAN and NIX and Person B, defendant MAZUR told Person B, "the CEO [of Biostem, defendant BRUNOEHLER] is a long-term, long time friend of ours, so we installed him."

Overt Act 78: On or about August 6, 2012, during a meeting with defendants KAPLAN and NIX and Person B, defendant MAZUR told Person B, "I've got 24 [million shares of Biostem] sitting on my desk, 23 eight-hundred or something, and the rest of it, once we get started, we'll get that."

<u>Overt Act 79</u>: On or about August 6, 2012, during a meeting with defendants KAPLAN and MAZUR and Person B, defendant NIX told Person B that defendant NIX was going to be responsible for liquidating the Biostem shares, and defendant MAZUR agreed, confirming that defendant NIX "calls the shots on that."

<u>Overt Act 80</u>: On or about August 6, 2012, during a meeting with defendants KAPLAN and NIX and Person B, defendant MAZUR told Person B, "they [Biostem] have ... probably 8 to 10 press releases they could put out tomorrow" in coordination with a manipulation campaign.

<u>Overt Act 81</u>: On or about August 6, 2012, during a meeting with defendants KAPLAN and NIX and Person B, defendant MAZUR told Person B that the campaign for Biostem might run "six months to a year," and defendant NIX observed, "I think the first four months will be your heavy four months, you may take a month or two off ... but if you've done right, you go right back at it again."

<u>Overt Act 82</u>: On or about August 6, 2012, during a meeting with defendants KAPLAN and MAZUR and Person B, defendant NIX told Person B that the per-share price at which he hoped to sell Biostem stock during a manipulation campaign was "anywhere from 80 cents to a buck ... 80 to a buck-fifteen, what's wrong with that? That's a lot of money."

<u>Overt Act 83</u>: On or about August 6, 2012, during a meeting with defendants KAPLAN and MAZUR and Person B, defendant NIX told Person B, "if you get in the deal, you're on my side ... there's 48 million shares, 24 million shares is theirs [<u>i.e.</u>,

defendants MAZUR and KAPLAN], 24 million is over here, you're over here with me, I pay you."

Overt Act 84: On or about August 6, 2012, during a meeting with defendants KAPLAN and NIX and Person B, defendant MAZUR told Person B, "there's a way to liquidate, but it's not to do it in five minutes" because "if the SEC ever comes looking at this stuff, they go, what is it, every fucking deal you're in, in 30 days, they die."

Overt Act 85: On or about August 6, 2012, during a meeting with defendants KAPLAN and NIX and Person B, defendant MAZUR told Person B that (a) a well-known actor ("Actor B") "wants to be the spokesperson" for a VNR for Biostem; and (b) it would cost "75 grand, and stock" to hire Actor B to do a VNR.

Overt Act 86: On or about November 5, 2012, in preparation for a manipulation campaign for Biostem, defendants MAZUR, KAPLAN, and BRUNOEHLER caused Biostem to execute a 1 for 1,000 reverse stock split of its issued and outstanding common stock, reducing the company's issued and outstanding common stock from approximately 273.37 million shares to approximately 273,366 shares.

Overt Act 87: On or about December 7, 2012, in preparation for a manipulation campaign for Biostem, defendants MAZUR, KAPLAN, and BRUNOEHLER caused Biostem to issue approximately 113,958,872 new shares of common stock.

Overt Act 88: On or about January 4, 2013, defendant MAZUR told Person B that "we'll start something in a couple of weeks, I have a phone room down in Florida that's gonna come in and start it off, walk this thing up to a buck, and then, you

know, I just want this thing doing two [hundred], to 300, to 400,000 shares a day." Defendant MAZUR also told the third party that he had a "three month deal at 50 grand a month" with the call center in Florida.

3. Additional Overt Acts Regarding the Scheme to Manipulate the Stocks of Public Companies

Overt Act 89: On or about August 25, 2011, after discussing the status of a manipulation campaign for a certain company, defendant MAZUR told defendant KAPLAN, "we'll have all our shit going, we'll have Genmed going, we'll have this thing going [referring to a manipulation campaign for Seesmart Holdings, Inc.], we'll have Gaiacor going [referring to a manipulation campaign for Gaiacor International], all at the same time, and at some point we'll have to do something with Navstar [referring to a manipulation campaign for Navstar Technologies Inc.], so we'll have that one going, that'll be four ... then we'll have Biostem going ... five deals going all at once." Defendant KAPLAN responded, "fantastic ... that'd be great because it would be nice going into the holidays this year not fucking strapped" for money. Defendant MAZUR agreed, stating "right ... we have four months to clean up."

Overt Act 90: On or about September 16, 2011, defendants KAPLAN and DAVIS discussed the status of various manipulation campaigns, and defendant DAVIS stated "I can't go get my contract [for a VNR] signed till they know that there's a promotion backing it up besides the VNR, because they're trying to raise money through the promotion." Defendant DAVIS then complained that defendant MAZUR had told him that defendant MAZUR

was "overloaded with deals" so that it was not clear when defendant MAZUR would start promoting that particular company, which was delaying defendant DAVIS' opportunity to get paid to do a VNR for the company.

Overt Act 91: On or about September 24, 2011, defendant KAPLAN discussed with a third party various ways that the third party could, among other things, restructure the third party's company to ensure that certain individuals were not involved in a particular stock deal. Defendant KAPLAN told the third party that the most common approach would be to do a reverse stock split of the company's stock. Defendant KAPLAN said that the other option, which defendants MAZUR and KAPLAN were advocating, was "essentially the same thing as reversing the stock without actually doing a reverse ... it doesn't look malicious." Defendant KAPLAN explained, "when you go and ... you do what we're doing with all this IR/PR [meaning stock promotion efforts] and trying to create liquidity ... and then all of a sudden you reverse the stock, it will look like ... somebody, with the help of management ... pumped this thing, dumped the shares, and then the way they're taking care of it is just reversing it."

Overt Act 92: On or about July 25, 2012, in order to persuade Person B to assist in the manipulation campaign for Biostem, or other future manipulation campaigns, defendant MAZUR told Person B that defendant MAZUR had been "playing the stock game" for the past 15 to 20 years. Defendant MAZUR explained to Person B the typical structure that defendant MAZUR would put into place for each manipulation campaign, including how he would "put a stranglehold on [the companies'] officers, directors" so

that they "don't do anything stupid." Defendant MAZUR explained that he did not usually handle the stock promotion itself, which was sometimes done by defendant NIX. Defendant MAZUR assured Person B, "we know how to tie the companies up" by taking senior secured notes on the companies and stated "we don't let any of them [meaning the companies] get rich."

///

///

///

COUNT TWO

[Defendants MAZUR, KAPLAN, NIX, POSSINO, MOYAL, HARRIS, and DAVIS]

[18 U.S.C. §§ 1348(1), 2]

[Securities Fraud]

25. The Grand Jury hereby realleges and incorporates by reference paragraphs 1 through 10 and 14 through 24 of this Indictment as though fully set forth herein.

26. Beginning no later than in or about December 2010, and continuing through at least in or about February 2012, in Los Angeles County, within the Central District of California, and elsewhere, defendants MAZUR, KAPLAN, NIX, POSSINO, MOYAL, HARRIS, and DAVIS, together with others known and unknown to the Grand Jury, knowingly and with intent to defraud, executed, attempted to execute, aided and abetted the execution of, willfully caused to be executed, and participated in a scheme and artifice to defraud investors as to material matters and in connection with securities of Genmed, an issuer with securities registered under section 12 of the Securities Exchange Act of 1934 and which was required to file reports under Section 15(d) of the Securities Exchange Act of 1934.

27. The fraudulent scheme operated and was executed, in substance, as set forth in paragraphs 14 through 24 and Overt Acts 1 through 48 and 89 through 92 of this Indictment.

COUNT THREE

[Defendants MAZUR, KAPLAN, NIX, PLATT, and BRUNOEHLER]

[18 U.S.C. §§ 1348(1), 2]

[Securities Fraud]

28. The Grand Jury hereby realleges and incorporates by reference paragraphs 1 through 10 and 14 through 24 of this Indictment as though fully set forth herein.

29. Beginning on a date unknown, but no later than in or about April 2011, and continuing through at least in or about January 2013, in Los Angeles and Orange Counties, within the Central District of California, and elsewhere, defendants MAZUR, KAPLAN, NIX, PLATT, and BRUNOEHLER, together with others known and unknown to the Grand Jury, knowingly and with intent to defraud, executed, attempted to execute, aided and abetted the execution of, willfully caused to be executed, and participated in a scheme and artifice to defraud investors as to material matters and in connection with securities of Biostem, an issuer with securities registered under section 12 of the Securities Exchange Act of 1934 and which was required to file reports under Section 15(d) of the Securities Exchange Act of 1934.

30. The fraudulent scheme operated and was executed, in substance, as set forth in paragraphs 14 through 24 and Overt Acts 49 through 92 of this Indictment.

COUNTS FOUR THROUGH FIFTEEN

[Defendants MAZUR, KAPLAN, NIX, POSSINO, MOYAL, HARRIS, DAVIS, PLATT, and BRUNOEHLER]

[15 U.S.C. §§ 78j(b), 78ff; 17 C.F.R. § 240.10b-5; 18 U.S.C. § 2]

[Securities Fraud]

31. The Grand Jury hereby realleges and incorporates by reference paragraphs 1 through 10 and 14 through 24 of this Indictment as though fully set forth herein.

32. Between in or about July 2009, and continuing through in or about January 2013, in Los Angeles and Orange Counties, within the Central District of California, and elsewhere, defendants MAZUR, KAPLAN, NIX, POSSINO, MOYAL, HARRIS, DAVIS, PLATT, and BRUNOEHLER, together with others known and unknown to the Grand Jury, knowingly and willfully, directly and indirectly, used and employed manipulative and deceptive devices and contrivances in connection with the purchase and sale of securities of several companies, including but not limited to Genmed and Biostem, by (1) employing a scheme to defraud; (2) making untrue statements of material fact and omitting to state material facts necessary to make the statements made, in light of the circumstances in which they were made, not misleading; and (3) engaging in acts, practices, and courses of business that operated as a fraud and deceit.

33. The manipulative and deceptive devices operated, in substance, as set forth in paragraphs 14 through 24 of this Indictment.

34. On or about the following dates, within the Central District of California, and elsewhere, defendants MAZUR, KAPLAN,

NIX, POSSINO, MOYAL, HARRIS, DAVIS, PLATT, and BRUNOEHLER, in furtherance of the manipulative and deceptive devices described above, directly and indirectly used and willfully caused to be used the means and instrumentalities of interstate commerce, the mails, and the facilities of a national securities exchange in connection with the purchases and sales of the following securities:

| COUNT | DEFENDANTS | DATE | TRANSACTION |
|---|---|---|---|
| FOUR | MAZUR<br>KAPLAN<br>NIX<br>POSSINO<br>MOYAL<br>HARRIS | 2/28/2011 | Sale of 292,897 shares of Genmed stock in account no. xxxx6961 in the name of London Finance Group at Legend Securities, Inc. |
| FIVE | MAZUR<br>KAPLAN<br>NIX<br>POSSINO<br>MOYAL<br>HARRIS | 2/28/2011 | Sale of 500,000 shares of Genmed stock in account no. xxxx9445 in the name of Calbridge Capital at Legend Securities, Inc. |
| SIX | MAZUR<br>KAPLAN<br>NIX<br>POSSINO<br>MOYAL<br>HARRIS<br>DAVIS | 3/30/2011 | Sale of 174,780 shares of Genmed stock in account no. xxxx6961 in the name of London Finance Group at Legend Securities, Inc. |
| SEVEN | MAZUR<br>KAPLAN<br>NIX<br>POSSINO<br>MOYAL<br>HARRIS<br>DAVIS | 3/30/2011 | Sale of 223,500 shares of Genmed stock in account no. xxxx9445 in the name of Calbridge Capital at Legend Securities, Inc. |

| COUNT | DEFENDANTS | DATE | TRANSACTION |
|---|---|---|---|
| EIGHT | MAZUR<br>KAPLAN<br>NIX<br>POSSINO<br>MOYAL<br>HARRIS<br>DAVIS | 4/14/2011 | Sale of 100,000 shares of Genmed in account no. xxxxxx5916 in the name of Scripted Consulting Group at BMA Securities, Inc. |
| NINE | MAZUR<br>KAPLAN<br>NIX<br>POSSINO<br>MOYAL<br>HARRIS<br>DAVIS | 4/15/2011 | Sale of 110,000 shares of Genmed stock in account no. xxxx6961 in the name of London Finance Group at Legend Securities, Inc. |
| TEN | MAZUR<br>KAPLAN<br>NIX<br>POSSINO<br>MOYAL<br>HARRIS<br>DAVIS | 4/15/2011 | Sale of 726,751 shares of Genmed stock in account no. xxxx9445 in the name of Calbridge Capital at Legend Securities, Inc. |
| ELEVEN | MAZUR<br>KAPLAN<br>PLATT<br>BRUNOEHLER | 3/1/2012 | Sale of 10,000 shares of Biostem in account no. xxx-10100-11 RR 9AZ in the name of Big Dog at Ascendiant Capital Markets LLC |
| TWELVE | MAZUR<br>KAPLAN<br>PLATT<br>BRUNOEHLER | 3/21/2012 | Sale of 9,050 shares of Biostem in account no. xxx-10100-11 RR 9AZ in the name of Big Dog at Ascendiant Capital Markets LLC |
| THIRTEEN | MAZUR<br>KAPLAN<br>BRUNOEHLER | 5/30/2012 | Sale of 132,000 shares of Biostem in account no. xxx-05353-14 RR G46 in the name of Burton Partners at Legend Securities, Inc. |
| FOURTEEN | MAZUR<br>KAPLAN<br>BRUNOEHLER | 5/29/2012 | Sale of 122,000 shares of Biostem in account no. xxx-05354-13 RR G46 in the name of Picasso at Legend Securities, Inc. |

| COUNT | DEFENDANTS | DATE | TRANSACTION |
|---|---|---|---|
| FIFTEEN | MAZUR<br>KAPLAN<br>BRUNOEHLER | 6/13/2012 | Sale of 80,000 shares of Biostem in account xxxx4506 in the name of Dojo at Alpine Securities, Inc. |

COUNTS SIXTEEN THROUGH TWENTY-FOUR

[Defendants MAZUR, KAPLAN, NIX, POSSINO, MOYAL, HARRIS, DAVIS, PLATT, and BRUNOEHLER]

[18 U.S.C. §§ 1343, 2]

[Wire Fraud]

35. The Grand Jury hereby realleges and incorporates by reference paragraphs 1 through 10 and 14 through 24 of this Indictment as though fully set forth herein.

A. <u>THE SCHEME TO DEFRAUD</u>

36. Beginning no later than in or about July 2009, and continuing through at least in or about January 2013, in Los Angeles County, within the Central District of California, and elsewhere, defendants MAZUR, KAPLAN, NIX, POSSINO, MOYAL, HARRIS, DAVIS, PLATT, and BRUNOEHLER, together with others known and unknown to the Grand Jury, knowingly and with intent to defraud, devised, participated in, and executed a scheme to defraud investor victims as to material matters, and to obtain money and property from investor victims by means of material false and fraudulent pretenses, representations, and promises, and the concealment of material facts.

37. The fraudulent scheme operated, in substance, as set forth in paragraphs 14 through 24 of this Indictment.

B. <u>USE OF THE WIRES</u>

38. On or about the following dates, within the Central District of California, and elsewhere, the following defendants, for the purpose of executing the above-described scheme to defraud, transmitted, caused the transmission of, and aided and

abetted the transmission of the following items by means of wire and radio communication in interstate and foreign commerce:

| COUNT | DEFENDANTS | DATE | ITEM WIRED |
|---|---|---|---|
| SIXTEEN | MAZUR<br>KAPLAN<br>NIX<br>POSSINO<br>MOYAL<br>HARRIS | 1/24/2011 | Wire transfer, via the Federal Reserve Bank's Fedwire system in New Jersey, of approximately $49,975 from account no. xxxx5539 in the name of Calbridge Capital in the Central District of California, to account no. xxxx7378 in the name of Apache Capital at Wells Fargo Bank in Arizona |
| SEVENTEEN | MAZUR<br>KAPLAN<br>NIX<br>POSSINO<br>MOYAL<br>HARRIS<br>DAVIS | 3/15/2011 | Wire transfer, via the Federal Reserve Bank's Fedwire system in New Jersey, of approximately $124,970 from account no. xxxx7639 in the name of Wellington Manor in the Central District of California, to account no. xxxx7378 in the name of Apache Capital at Wells Fargo Bank in Arizona |
| EIGHTEEN | MAZUR<br>KAPLAN<br>NIX<br>POSSINO<br>MOYAL<br>HARRIS<br>DAVIS | 3/25/2011 | Telephone call between defendants KAPLAN and NIX in the Central District of California, and Unindicted Co-Conspirator 1 in The Netherlands |
| NINETEEN | MAZUR<br>KAPLAN<br>NIX<br>POSSINO<br>MOYAL<br>HARRIS<br>DAVIS | 4/5/2011 | Telephone call between defendants NIX, POSSINO, and MOYAL in the Central District of California, and defendant HARRIS in Arizona |

| COUNT | DEFENDANTS | DATE | ITEM WIRED |
|---|---|---|---|
| TWENTY | MAZUR<br>KAPLAN<br>NIX<br>POSSINO<br>MOYAL<br>HARRIS<br>DAVIS | 4/14/2011 | Telephone call between defendants NIX and MOYAL in the Central District of California, and defendant MAZUR in Mexico |
| TWENTY-ONE | MAZUR<br>KAPLAN<br>PLATT<br>BRUNOEHLER | 5/12/2011 | Wire transfer, via the Federal Reserve Bank's Fedwire system in New Jersey, of approximately $125,000 from account no. XXXXXX4072 in the name of London Finance Group at JP Morgan Chase Bank in California, to account no. XXXX8073 in the name of Ana Enterprises at Wachovia Bank in Florida |
| TWENTY-TWO | MAZUR<br>KAPLAN<br>PLATT<br>BRUNOEHLER | 7/3/2011 | Telephone call between defendant MAZUR in the Central District of California, and defendant BRUNOEHLER in Florida |
| TWENTY-THREE | MAZUR<br>KAPLAN<br>PLATT<br>BRUNOEHLER | 9/30/2011 | Telephone call between defendant MAZUR in the Central District of California, and defendant BRUNOEHLER in Florida, and a third party |
| TWENTY-FOUR | MAZUR<br>KAPLAN<br>BRUNOEHLER | 10/20/2011 | Wire transfer, via the Federal Reserve Bank's Fedwire system in New Jersey, of approximately $10,000 from account no. XXXX72738 in the name of Biostem U.S. Corp at M&I Bank in Florida, to account no. XXXXXX3637 in the name of NVO at Wells Fargo Bank in California |

COUNTS TWENTY-FIVE THROUGH TWENTY-SIX

[Defendants NIX, POSSINO, and HARRIS]

[18 U.S.C. §§ 1956(a)(2)(A), 2]

[International Promotional Money Laundering]

39. The Grand Jury hereby realleges and incorporates by reference paragraphs 1 through 10, 14 through 24, 26, 29, 32 through 34, and 36 through 38 of this Indictment as though fully set forth herein.

40. As used in these Counts Twenty-Five and Twenty-Six, the term "Specified Unlawful Activity" means:

a. Securities fraud, in violation of Title 18, United States Code, Section 1348(1);

b. Securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff(a), and Title 17, Code of Federal Regulations, Section 240.10b-5; and

c. Wire fraud, in violation of Title 18, United States Code, Section 1343.

41. On or about the following dates, in Los Angeles County, within the Central District of California, and elsewhere, defendants NIX, POSSINO, and HARRIS, with the intent to promote the carrying on of Specified Unlawful Activity, transported, transmitted, and transferred, and attempted to transport, transmit, and transfer, the following monetary instruments and funds to a place inside the United States from and through a place outside the United States:

| COUNT | DATE | MONETARY INSTRUMENT OR FUNDS |
|---|---|---|
| TWENTY-FIVE | 1/25/2011 | Transfer of approximately $40,000 from account xxxxxxxx1070 in the name of Raincity Marketing Group at HSBC Bank in Canada, to account xxxxxxxx5508 in the name of Stockmister, LLC at Bank of America in the United States, to promote the Genmed manipulation campaign |
| TWENTY-SIX | 3/22/2011 | Transfer of approximately $125,000 from account xxxxxxxx1070 in the name of Raincity Marketing Group at HSBC Bank in Canada, to account xxxxxxxx8588 in the name of Lake Media Group, LLC at JP Morgan Chase Bank in the United States, to promote the Genmed manipulation campaign |

COUNTS TWENTY-SEVEN THROUGH THIRTY-TWO

[Defendants MAZUR and KAPLAN]

[18 U.S.C. § 1956(a)(1)(B)(i)]

[Concealment Money Laundering]

42. The Grand Jury hereby realleges and incorporates by reference paragraphs 1 through 10, 14 through 24, 26, 29, 32 through 34, and 36 through 38 of this Indictment as though fully set forth herein.

43. As used in these Counts Twenty-Seven through Thirty-Two, the term "Specified Unlawful Activity" means:

a. Securities fraud, in violation of Title 18, United States Code, Section 1348(1);

b. Securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff(a), and Title 17, Code of Federal Regulations, Section 240.10b-5; and

c. Wire fraud, in violation of Title 18, United States Code, Section 1343.

44. On or about the following dates, in Los Angeles County, within the Central District of California, and elsewhere, defendants MAZUR and KAPLAN conducted, attempted to conduct, aided and abetted the conducting of, and willfully caused others to conduct the following financial transactions that in fact involved the proceeds of Specified Unlawful Activity, knowing that (a) the property involved in the following financial transactions represented the proceeds of some form of unlawful activity constituting a felony under state or federal law, and (b) the transactions were designed in whole and in part to

///

conceal and disguise the nature, location, source, ownership, and control of the proceeds of Specified Unlawful Activity:

| COUNT | DEFENDANTS | DATE | FINANCIAL TRANSACTION |
|---|---|---|---|
| TWENTY-SEVEN | MAZUR KAPLAN | 4/27/2011 | Transfer of approximately $12,387 from Wells Fargo Bank account xxxxxx4072 in the name of London Finance Group to Wells Fargo Bank account xxxxxx5276 in the name of RTO |
| TWENTY-EIGHT | MAZUR KAPLAN | 4/27/2011 | Transfer of approximately $4,670 from Wells Fargo Bank account xxxxxx4072 in the name of London Finance Group to Citibank account xxxxxx2578 in the name of Dojo |
| TWENTY-NINE | MAZUR KAPLAN | 4/28/2011 | Transfer of approximately $5,000 from Wells Fargo Bank account xxxxxx4072 in the name of London Finance Group to Wells Fargo Bank account xxxxxx5585 in the name of Aramis |
| THIRTY | MAZUR KAPLAN | 6/4/2012 | Transfer of approximately $30,000 from Wells Fargo Bank account xxxxxx3241 in the name of Picasso to Wells Fargo Bank account xxxxxx5276 in the name of RTO |
| THIRTY-ONE | MAZUR KAPLAN | 6/5/2012 | Transfer of approximately $11,500 from Wells Fargo Bank account xxxxxx3241 in the name of Picasso to Wells Fargo Bank account xxxxxx5276 in the name of RTO |

| COUNT | DEFENDANTS | DATE | FINANCIAL TRANSACTION |
|---|---|---|---|
| THIRTY-TWO | MAZUR<br>KAPLAN | 6/7/2012 | Transfer of approximately $23,500 from Wells Fargo Bank account xxxxxx3241 in the name of Picasso to Wells Fargo Bank account xxxxxx5585 in the name of Aramis |

ADDITIONAL SENTENCING ENHANCEMENTS

[Defendants MOYAL and DAVIS]

[18 U.S.C. § 3147]

[Commission of Offense While on Pretrial Release]

45. The Grand Jury hereby realleges and incorporates by reference paragraphs 1 through 10, 12 through 24, 26, 32 through 34, and 36 through 38 of this Indictment as though fully set forth herein.

46. At the time of the offenses charged in Counts One, Two, Four through Ten, and Sixteen through Twenty of this Indictment, defendant MOYAL was on pretrial release under Title 18, United States Code, Chapter 207, in the federal criminal case of United States v. Edon Moyal, CR 09-1336-JAH (S.D. Cal.).

47. At the time of the offenses charged in Counts One and Two of this Indictment, defendant DAVIS was on pretrial release under Title 18, United States Code, Chapter 207, in the federal criminal case of United States v. Joey Davis, CR 11-330-JHN (C.D. Cal.).

FORFEITURE ALLEGATION ONE

[18 U.S.C. § 981(a)(1)(C), 28 U.S.C. § 2461(c), and 18 U.S.C. § 982(a)(2)]

[Criminal Forfeiture of Proceeds Obtained From Conspiracy, Securities Fraud, and Wire Fraud]

48. Pursuant to Federal Rule of Criminal Procedure 32.2, notice is hereby given to the defendants that the United States will seek forfeiture as part of any sentence in accordance with Title 18, United States Code, Section 981(a)(1)(C), Title 28, United States Code, Section 2461(c), and Title 18, United States Code, Section 982(a)(2), in the event of any defendant's conviction under any of Counts One through Twenty-Four of this Indictment.

49. Defendants SHERMAN MAZUR, ARI KAPLAN, GROVER HENRY COLIN NIX IV, also known as ("aka") "Colin Nix," REGIS POSSINO, EDON MOYAL, MARK HARRIS, JOSEPH DAVIS, aka "Joey Davis," CURTIS PLATT, and DWIGHT BRUNOEHLER shall forfeit to the United States the following property:

a. All right, title, and interest in any and all property, real or personal, constituting or derived from any proceeds obtained, directly or indirectly, as a result of any offense set forth in any of Counts One through Twenty-Four of this Indictment; and

b. A sum of money equal to the total value of the property described in subsection (a) above. For each of Counts One through Twenty-Four for which more than one defendant is found guilty, each such defendant shall be jointly and severally liable for the entire amount forfeited pursuant to that Count.

///

50. Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), and Title 18, United States Code, Section 982(b), each defendant shall forfeit substitute property, up to the total value of the property described in the preceding paragraph, if, as a result of any act or omission of a defendant, the property described in the preceding paragraph, or any portion thereof (a) cannot be located upon the exercise of due diligence; (b) has been transferred, or sold to, or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

FORFEITURE ALLEGATION TWO

[18 U.S.C. § 981(a)(1)(A), 28 U.S.C. § 2461(c), and 18 U.S.C. § 982(a)(1)]

[Criminal Forfeiture of Property Involved in Money Laundering]

51. Pursuant to Federal Rule of Criminal Procedure 32.2, notice is hereby given to the defendants that the United States will seek forfeiture as part of any sentence in accordance with Title 18, United States Code, Section 981(a)(1)(A), Title 28, United States Code, Section 2461(c) and Title 18, United States Code, Section 982(a)(1) in the event of any defendant's conviction under any of Counts Twenty-Five through Thirty-Two of this Indictment.

52. Defendants SHERMAN MAZUR, ARI KAPLAN, GROVER HENRY COLIN NIX IV, also known as "Colin Nix," REGIS POSSINO, and MARK HARRIS shall forfeit to the United States the following property:

a. All right, title, and interest in any and all property, real or personal, involved in any offense set forth in any of Counts Twenty-Five through Thirty-Two of this Indictment, or conspiracy to commit such offense, and any property traceable to such property, including all monies or other property that was the subject of, all commissions, fees, and other property that were derived from and all monies or other property that was used in any manner or part to facilitate the commission of any violation of Title 18, United States Code, Section 1956; and

b. A sum of money equal to the total value of the property described in subsection (a) above. For each of Counts Twenty-Five through Thirty-Two for which more than one defendant is found guilty, each such defendant shall be jointly and

severally liable for the entire amount forfeited pursuant to that Count.

53. Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), and Title 18, United States Code, Section 982(b), each defendant shall forfeit substitute property, up to the total value of the property described in the preceding paragraph, if, as a result of any act or omission of a defendant, the property described in the preceding paragraph, or any portion thereof (a) cannot be located upon the exercise of due diligence; (b) has been transferred, or sold to, or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

commingled with other property that cannot be divided without difficulty.

A TRUE BILL

/S/

Foreperson

ANDRÉ BIROTTE JR.
United States Attorney

ROBERT E. DUGDALE
Assistant United States Attorney
Chief, Criminal Division

RICHARD E. ROBINSON
Assistant United States Attorney
Chief, Major Frauds Section

STEPHEN A. CAZARES
Assistant United States Attorney
Deputy Chief, Major Frauds Section

JAMES A. BOWMAN
JEREMY D. MATZ
PETER W. BALDWIN
Assistant United States Attorneys
Major Frauds Section